## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:21-cv-01378

ROBIN SLOVER,

     Plaintiff,

v.

UNIVERSITY OF COLORADO, through its governing body, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate; and THOMAS MAJCHER, Chief of Pediatric Anesthesiology (in his individual capacity),

     Defendants.

---

## COMPLAINT

---

     Plaintiff, Robin Slover (the "Plaintiff" or "Dr. Slover"), by and through her undersigned attorneys, states and alleges as follows:

### NATURE OF THE CASE AND THE PARTIES

     1.    This is a civil action for damages and other relief against Defendant, the University of Colorado ("CU") under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 20003 *et seq*. ("Title VII"); the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 2601 *et seq*. ("ADEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"); the ADA Amendments Act of 2008, 42 U.S.C. § 12101(3)(A) ("ADAAA"); and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., and against Defendant, Thomas Majcher ("Defendant Majcher" or "Dr. Majcher"), in his individual capacity, under the Civil Rights Act of 1871, 42 U.S.C. § 1983, for discrimination on the grounds of age and disability, retaliation for protected complaints, and other deleterious terms and conditions of employment.  Supplemental claims are made pursuant to the Colorado Anti-Discrimination Act, § 24-34-402, *et seq*. ("CADA").

2.      Plaintiff Dr. Robin Slover ("Plaintiff") is a resident of the State of Colorado and performed work for Defendant CU at all times relevant to this Action.

3.      Defendant University of Colorado, sued through its governing body, The Regents of the University of Colorado, a body corporate, ("Defendant CU") is a state institution of higher education established and regulated by Article IX, §§ 12 and 13, Colorado Constitution and State statutory law, C.R.S. § 23-20-101, *et seq.* The University may sue and be sued through its governing body, the Regents of the University of Colorado.

4.      Defendant Majcher has been and remains a Professor of Clinical Practice in Anesthesiology and Director of Pediatric Anesthesiology at Defendant CU's Anschutz Medical Campus.  In that capacity, Defendant Majcher acted under color of law in performance of his duties as an official of Defendant CU.  Dr. Majcher is sued in his individual capacity.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      This Court has supplemental jurisdiction over claims made pursuant to CADA under 28 U.S.C. § 1367(a) as they are part of the same case or controversy as the claims over which this Court has original jurisdiction.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

8.      At all relevant times, Defendant CU was an "employer" within the meaning of Title VII, the ADA, the Rehabilitation Act and the ADEA.

9.      Plaintiff has exhausted all administrative prerequisites to the filing of this action.

10.     This lawsuit was commenced within 90 days of Plaintiff receiving a Notice of Right to Sue, dated February 24, 2021, from the United States Equal Employment Opportunity Commission ("EEOC") with respect to the Charge of Discrimination, number 32A-2019-00626.

11.     Plaintiff has provided a notice of claim to the Office of the Colorado Attorney General, dated December 30, 2019 pursuant to the Colorado Governmental Immunity Act, C.R.S. § 24-10-109 ("CGIA").

## FACTUAL ALLEGATIONS

12.     Plaintiff is a seventy (70) year old female who holds double board certification in anesthesiology and pain management.  She is a member of the Church of the Latter-Day Saints ("LDS").

13.     Plaintiff graduated from the University of Utah School of Medicine in 1975, thereafter completing her residency in anesthesiology at Defendant CU.

14.     Plaintiff has worked for Defendant CU since that time, save for one year in private practice, a three-year stint in the Republic of Korea and an appointment, upon her return, at the United States Department of Veterans' Affairs.

15.     Plaintiff organized the first chronic pain clinic for Defendant CU and was co-founder of its acute pain service.  She attended at Defendant CU's Pain Management Clinic and initiated the Pediatric Pain Management Clinic, serving as its sole director until 2012.

16.     Defendant CU is a system of public universities in the State of Colorado consisting of four campuses: University of Colorado Boulder, University of Colorado, Colorado Springs, University of Colorado Denver and the Anschutz Medical Campus ("CU Anschutz").

17.     Vesna Jevtovic-Todorovic ("Dr. Todorovic") is the Chair of the Department of Anesthesiology at Defendant CU and is charged with enforcing all rules promulgated by Defendant CU to oversee, enforce and properly conduct the business of the Department, including supervision and discipline of its employees as well as addressing any concerns raised thereby.

18.     Defendant Majcher is the Director of Pediatric Anesthesiology at CU Anschutz and is charged with enforcing all rules promulgated by Defendant CU and Dr. Todorovic, his

3

direct supervisor, to oversee, enforce and properly conduct the business of the pediatric anesthesiology division, including supervision and discipline of its employees as well as addressing any concerns raised thereby.

19.     At all times relevant to this action, Plaintiff maintained a position as Associate Professor in CU's Department of Anesthesiology.

20.     It was, and remains, a longstanding practice of Defendant CU that this type of appointment would be not be suspended or terminated, absent a showing of sufficient cause.

21.     Upon information and belief, during the course of Plaintiff's employment, no faculty member holding this type of appointment within Defendant CU's School of Medicine was ever suspended or terminated without sufficient cause.

22.     Plaintiff is a long-standing faculty member with outstanding credentials, training and experience.

23.     Plaintiff had entitlement to and expectation of continued employment, absent a showing of sufficient cause for suspension or termination of same.

24.     Throughout her career and at all times relevant to this matter, Plaintiff has been and remains licensed by the Board of Medical Examiners of the State of Colorado and is certified by the United States Department of Justice to prescribe controlled substances.

25.     The rules governing Defendant CU's School of Medicine apply to all members of the faculty, including Plaintiff and Defendant Majcher, requiring them to adhere to the highest standard of academic honesty and integrity.

26.     Furthermore, Defendant CU's Anti-Discrimination Policy prohibits discrimination and retaliation.

***Dr. Slover's Role at the Pediatric Pain Management Clinic ("PPMC")***

27.     Defendant CU maintained its PPMC, which was situated at Children's Hospital of Colorado ("CHCO"), and Plaintiff worked at that location on Defendant CU's Anschutz Medical

Campus.

28.     Plaintiff's role was to develop and run a chronic pain service and, in order to execute that role, she hired a multi-disciplinary team including a psychologist, nurse, physical therapist and social worker, among others, in order to form a full pain management team.

29.     In 2010, Plaintiff hired Dr. Sheryl Kent, a clinical psychologist.  Subsequently, Plaintiff and Dr. Kent agreed to share the directorship of the service, which enabled Plaintiff to devote time to clinical care, research, teaching and the development of a pediatric pain fellowship program.

30.     Upon Plaintiff's leadership, Defendant CU successfully initiated a board-eligible pediatric pain management fellowship, one of fewer than fifteen in the United States, and its first fellow completed training in 2018.

31.     Subsequently, Dr. Kent assumed many administrative responsibilities for the service and was named the sole director, with Plaintiff being designated the medical director.

32.     Dr. Kent adopted a team approach with all members having "equal votes" on patient care decisions and the PPMC's operations, which resulted in tensions based on non-physicians, who lacked the licensure or training to perform nerve blocks, overruling Plaintiff's recommendations with respect to their use.

33.     A young, male, pain management specialist, Dr. Seth Eisdorfer, was hired and it became apparent that Dr. Kent and other team members favored Dr. Eisdorfer over Dr. Slover.

***Hostile Work Environment and Plaintiff's Initial Reporting of Discrimination***

34.     Plaintiff, the most senior and oldest member of the PPMC team, was increasingly ostracized at work by her colleagues including Dr. Kent, who would not engage with her save for brief salutations, and other members of the PPMC sensed this and acted similarly.

35.     Plaintiff was the sole member of the PPMC team who was a member of the Church of the Latter-Day Saints.

36.     On multiple occasions, Dr. Kent and another colleague would giggle and titter to one another at Plaintiff's expense, alluding to her age, among other things, in her presence.

37.     After leadership of Plaintiff's Church issued a determination concerning the status of children of gay marriages, Dr. Kent, who disagreed with the Church's position, became upset, attributing it to Plaintiff as a member, while not inquiring as to Plaintiff's personal beliefs.

38.     Plaintiff expressed her concerns that she had been ostracized based upon her age and religion, and the fact that non-physicians on the team were preventing her from implementing her medical expertise to Defendant Majcher and he took no steps to rectify the situation.

39.     Plaintiff sought assistance from the Office of the Ombudsman, reporting that she was the victim of a hostile work environment and workplace harassment.  She detailed that her colleagues, particularly Dr. Kent, ignored and marginalized her and that she felt unwelcome and disrespected as a consequence, with no rational explanation, save for a discriminatory one, related to her age and religion, as to why she was being treated in such a derogatory manner.

40.     Upon information and belief, both Dr. Kent and Dr. Eisdorfer are under forty-five (45) years of age.

***Dr. Slover's Encounter with Dr. Todorovic and the Pretextual Accusations made to Cover Up Age-Related Discrimination***

41.     In early 2018, a baseless and glaringly pretextual accusation was made against Plaintiff, that which served as nothing more than a cover-up of the discriminatory animus towards Plaintiff.

42.     More specifically, during that time, Plaintiff met with Dr. Todorovic to discuss her annual PRiSM performance review.

43.     During this meeting, Dr. Todorovic was openly hostile to Plaintiff and told Plaintiff that she should work "really hard" to find her own replacement.  Expectedly, this took Plaintiff aback as she had no plans to retire from her position.

6

44.     Dr. Todorovic expressed dissatisfaction with the PPMC and blamed Plaintiff for the perceived issues with the clinic, attributing the perceived pitfalls to Plaintiff's lack of leadership.  Dr. Todorvic claimed that Plaintiff bore the onus of accountability.

45.     However, Plaintiff had not been the director of the service for many years, had no control over any of the perceived issues that Dr. Todorovic believed to have existed.

46.     Given its baseless nature, Plaintiff explained this to Dr. Todorovic, specifically that she lacked the power or responsibility to address any such concerns.

***Dr. Majcher's Meeting with and Accusations Against Plaintiff***

47.     In July 2018, Dr. Majcher convened at meeting with Plaintiff, at which Dr. Kent was present.  Dr. Majcher informed Plaintiff that unnamed sources had reported to him that she had been sleeping in her office, had missed appointments and was confusing patient names, indicating that he had concerns with respect to Plaintiff's memory and ability to perform her work duties.

48.     Dr. Majcher notified Plaintiff that he was placing her on a thirty (30) day leave during which she was instructed not to come to the office as well as being required to undergo a psychological evaluation with the Colorado Physician Health Program ("CPHP") in a "for-cause evaluation".

49.     Prior to the July 2018 meeting, neither Dr. Majcher nor anyone in the administration of the PPMC had ever raised any concerns with Plaintiff with respect to her memory or ability to fulfill her responsibilities.

50.     Contemporaneously with the referral for purported issues of professionalism, mood lability and potential cognitive problems, Defendant Majcher drafted a memorandum, dated July 9, 2018, indicating that the PPMC had been existing in a dysfunctional state for at least a year with disagreements among team members as to patient care, unilateral modifications to patient treatment plans, a significant backlog for new patient appointments and poorly

7

facilitated transition of pediatric patients to adult providers, none of which were under Plaintiff's aegis or for which she was responsible.

51.      In the memorandum, Defendant Majcher, who had not undertaken any independent investigation, stated that "the team blames their dysfunction on Dr. Slover's erratic behavior" and concluding that Plaintiff exhibited signs of decreased cognitive function, resulting in his referral to CPHP during a one month paid administrative leave with reassessment in thirty (30) days.

52.      Notably, Plaintiff's referral to the CPHP was not an isolated occurrence.  At a minimum, four other physicians in the department have been ordered to undergo cognitive or psychiatric testing, with the purpose of embarrassment, humiliation and in spurious attempts to provoke their respective discharges or cause them to resign from their longstanding positions at Defendant CU.  Moreover, negative CPHP findings would result in limitation, suspension or revocation of their licenses to practice medicine in the State of Colorado, the most deleterious potential outcome to their professional careers.

53.      Had Defendant Majcher and his supervisor, Dr. Todorovic, desired to protect patients and even the physicians themselves, far more salient alternatives were available including referral to the Office of Professional Excellence, which they did not exercise. Moreover, and critically, none of the referred physicians, including Dr. Slover, were found unfit to practice medicine, establishing that the psychiatric evaluation was merely a tool in an intimidation and harassment scheme formulated by Dr, Todorovic and implemented through her surrogate, Defendant Majcher, for illegal purposes.

54.      The allegations reported by Defendant Majcher in the memorandum were patently false and defamatory. For example, Defendant Majcher reported that Plaintiff had been "sleeping in her office, physician team room", and exhibited "dozing during patient interactions".  In reality, while she had on occasion rested in her office, notably after spending long nights

8

addressing her father's care, she had never done so while caring for a patient.  Contrary to Defendant Majcher's false and defamatory accusations, her occasional attempts to rest did not interfere with patient care or clinic operations and never occurred during patient procedures or interactions.

55.     As to the allegations of emotional lability, these allegations were baseless and reflected a dishonest exaggeration of Dr. Slover's appropriate emotional reactions to being bullied and subject to a hostile work environment.  For example, in a Monday Meeting of the chronic pain team, a physical therapist had berated Plaintiff in the presence of others for placing a patient in a brace.  It was an occupational therapist, and not Dr. Slover, who had placed the patient in a brace.  Dr. Kent permitted the verbal abuse to continue unchecked.  Dr. Kent and the physical therapist made jokes at Plaintiff's expense and she felt questioned, scrutinized and bullied by such unprofessional conduct.

56.     Plaintiff was evaluated at the earliest opportunity by Dr. Donald Misch of CPHP who issued a report, dated August 2, 2018, in which CPHP informed Dr. Majcher that "Dr. Slover's score on the MoCA [the Montreal Cognitive Assessment test for dementia] was perfect", further finding "no evidence that Dr. Slover suffers from a medical or psychiatric condition, including a substance abuse disorder, that would impact her ability to practice medicine with reasonable skill and safety to patients".  Furthermore, the report identified the fact that Plaintiff had reported a hostile and harassing work environment, and that this environment may have effected Plaintiff's ability to communicate effectively with the team.  Additionally, the examiner stated that a "MiniCog" exam, a screening test for cognitive impairments such as Alzheimer's disease and dementia, could be performed but it was unnecessary under the circumstances.

57.     The CPHP reported to Dr. Majcher that Plaintiff had received a complete clearance and should return to work immediately.  The CPHP also recommended that the entire

chronic pain team take a communications skills course as part of an effort to ameliorate the hostile work environment that existed in the unit.

58.     Despite having been cleared by CPHP to return to work, Defendant Majcher did not permit her to do so until the full thirty (30) days of the suspension had elapsed.

59.     Pursuant to CPHP's recommendation, Plaintiff took the communications skills course; however, other members of the chronic pain team failed to comply with the recommendation.

60.     Neither Defendant Majcher, nor Dr. Kent, informed Dr. Slover's colleagues that Dr. Slover had performed perfectly on the CPHP exam or that CPHP had concluded that there was a hostile work environment in the unit.

61.     Shortly after Dr. Slover returned to work, Dr. Eisdorfer, Dr. Slover's much younger colleague, was awarded the title of medical director held to that point by Plaintiff and Dr. Slover was demoted to clinician.  The removal of Plaintiff's medical director title was viewed by others in the clinic as a diminution of her standing and the elevation of Dr. Eisdofer at Plaintiff's expense.

62.     Upon her return, Plaintiff's patients reported that they were pleased to see her, in direct contrast to statements made by members of the team to her, stating that the patients preferred to be treated by Dr. Eisdorfer.

63.     Thereafter, Plaintiff was subjected to microscopic scrutiny by Dr. Majcher and others.  For example, members of the chronic pain team would slip into Plaintiff's office as she was reading medical journals in attempts to catch her napping.  Various team members reported the most trivial incidents as indications of Plaintiff's purported uncooperativeness.

64.     As clinical director of pediatric pain management, Dr. Kent was required to periodically meet with Plaintiff to provide her with performance critiques as well as the opportunity to address any concerns that Plaintiff might have.

65.     Likewise, as the chief of pediatric anesthesiology, Defendant Majcher was required to periodically meet with Plaintiff to provide her with performance critiques as well as the opportunity to address any concerns that Plaintiff might have.

66.     However, between August and December 2018, Dr. Majcher cancelled every mandatory PRiSM review with Plaintiff and met with her on only one occasion.  Dr. Kent did not meet with Plaintiff whatsoever.

67.     During the period August through December 2018, neither Dr. Kent nor Dr. Eisdorfer expressed or conveyed any dissatisfaction with Plaintiff's work to her. Plaintiff repeatedly inquired of Dr. Eisdorfer whether he had any issues with her or with her work and he told her that there was none.

68.     Between July 2018 and January 22, 2019, Defendant Majcher never counseled Plaintiff nor informed her that there were any issues with respect to her behavior.

69.     Furthermore, Defendant Majcher expressed to Plaintiff his expectation that she would have resigned within two weeks of the summary suspension

***Defendant Majcher Seeks Plaintiff's Summary Suspension from the Medical Staff***

70.     On January 22, 2019, Defendant Majcher sent an e-mail to Dr. Hyman, the Medical Vice-President of CHCO as well as the head of the Medical Executive Committee ("MEC") at CHCO, in which he asserted, falsely, that Plaintiff was suffering from a potential cognitive decline, noting that he had referred Plaintiff to CPHP several months earlier.

71.     Defendant Majcher failed to notify Dr. Hyman of CPHP's unequivocable conclusion in Plaintiff's favor.  Instead of accurately reporting that Dr. Slover had received a perfect score, Defendant Majcher misrepresented that CPHP had informed him that the cost and burden of conducting further testing was not clinically indicating and that it had not been conducted because "a provider could not be found to perform this examination."

72.     Defendant Majcher further informed Dr. Hyman that he had identified four

problematic cases, which he asserted should result in the summary suspension of Plaintiff's medical privileges at CHCO.

73.     Defendant Majcher had made no clinical observation of Plaintiff and had no personal knowledge whatsoever of the alleged four cases, nor did he review any of those patients' medical records prior to sending the January 22, 2019 e-mail in which he accused Plaintiff of deficiencies.

74.     Defendant Majcher did not conduct interviews of patients or staff prior to sending the January 22, 2019 e-mail.

75.     Prior to sending the January 22, 2019 e-mail, Defendant Majcher did not bring any such cases to Plaintiff's attention or inquire as to her recollection of them. As the chief of pediatric anesthesiology, it was Defendant Majcher's responsibility to have done so, if indeed those cases were real.

76.     Defendant Majcher knew his allegations concerning the four cases were baseless, or he was deliberately indifferent to the truth of his allegations.  In either event, Defendant Majcher had no legitimate basis to cause the removal of Plaintiff from her position and the medical staff of CHCO, but that was his intent and he took actions to damage Plaintiff, with the desired outcome.

77.     Defendant Majcher testified under oath at a CHCO administrative hearing with respect to Plaintiff's clinical staff privileges, that he perceived her to be suffering from cognitive impairment despite his lack of professional expertise in geriatric medicine, clinical psychology, neurology or psychiatry to substantiate a basis for that perception, which was erroneous and false, *ab initio.*

78.     Based solely upon Defendant Majcher's January 22, 2019 e-mail, the MEC summarily suspended Plaintiff's medical staff privileges on January 23, 2019.  On that date, Plaintiff was instructed to present herself at Defendant Majcher's office at which time Dr.

Hyman and Defendant Majcher informed her that her privileges were suspended effective immediately and that her access to all medical records had been terminated.

79.     The following week, Plaintiff asked Defendant Majcher whether the suspension had resulted from her age or gender and he falsely replied that she had been suspended for disreputable actions when he knew that this was a pretext for discriminatory and illegal conduct.

80.     As a consequence of Plaintiff's suspension, Defendant CU terminated her compensation and benefits, effective June 2019, and she sustained significant financial loss as a consequence thereof.

### *Dr. Todorovic Expresses Her Disdain for Older Faculty Members*

81.     On November 8, 2019, Dr. Todorovic made a presentation to the annual meeting of the Society of Academic Anesthesiology and Perioperative Medicine ("SAAAPM").  The remarkably transparent working title of the address was: "The Faculty Member Who Needs to Retire but Won't," a direct indication of the intent to force senior members of the department to resign or face removal.  Dr. Todorovic ostensibly delegated various responsibilities with respect to interaction with faculty members to her direct subordinate, Defendant Majcher, as her agent, while maintaining involvement in decision-making.

82.     Dr. Slover filed a charge of discrimination with the EEOC against Defendant CU, No. 32A-2019-00626, on December 3, 2019, in which Dr. Slover alleged that discrimination on the basis of age, among other protected characteristics, was endemic to Dr. Todorovic's management of the department.

83.     Subsequent thereto, on January 30, 2020, nine members of the department, including Plaintiff, prepared and delivered a letter directed to CU's Board of Regents which contained charges of anti-Semitism, age discrimination and harassment.  The letter stated, in pertinent part that the nine faculty members "have done this, not for economic gain, but because there is an abusive and unhealthy hostile environment that has led to many talented doctors and

researchers" being forced out of the department, discharged, or not having long-standing contracts renewed. All of the signers were over the age of fifty and, save for Plaintiff, all were Jewish.

84.     To the date of this Complaint, Defendant CU has failed to address the allegations in the January 30, 2020 letter on a systemic basis. Instead, Defendant CU engaged an outside firm to conducted biased investigations of individual complaints. Those investigations, which did not take into account the pervasiveness of the discriminatory and retaliatory schema involved and reveal a pattern of foregone conclusions, have been used to marginalize and dismiss the legitimate discrimination and retaliation complaints of numerous faculty members concerning the department overseen by Dr. Todorovic and Defendant Majcher.

***Defendant Majcher Expresses his Perception of Dr. Slover as an Impaired Individual***

85.     Pursuant to the ADA and the Rehabilitation Act (the "Acts"), individuals with disabilities are protected from employment discrimination, including those who are not disabled but are perceived as such by their employers.

86.     Plaintiff is a disabled individual pursuant to statutory authority in that she has a physical condition, hearing loss, which substantially limits a major life activity.

87.     Notwithstanding that Plaintiff does not have a mental impairment, Plaintiff is statutorily deemed a disabled person for the purpose of the Acts if she is subject to an adverse employment action and is believed to have such a disability.

88.     Plaintiff is entitled to the protection of the Acts based upon her standing as an individual with a perceived disability, notwithstanding the gross inaccuracy and inappropriateness of such a categorization by Defendant Majcher.

89.     After excessive delay, approximately eighteen (18) months following her summary suspension, CHCO conducted an administrative hearing in order to determine whether such suspension was warranted as well as whether Plaintiff's suspension would be lifted, the

terms under which a return to active staff privileges would be appropriate, or whether she would be removed from the medical staff altogether.  It is worth noting that this was an inordinate lapse of time between her summary suspension and her opportunity to be heard.

90.     In the course of that hearing, which commenced on June 29, 2020, Defendant Majcher testified under oath that he perceived Plaintiff to be suffering from cognitive impairment in 2018.

91.     Defendant Majcher, an anesthesiologist, has no background in neurology, neuropsychology, psychiatry or psychology whatsoever but, nevertheless, deemed himself capable of rendering such an opinion and sharing it with the MEC in the awareness that Plaintiff's mental acuity and cognitive skills would be called into question, despite the fact that she had performed perfectly on testing administered by an expert in the field.

92.     Defendant Majcher's actions were willful, intentional and retaliatory as the genesis therefor arose out of and was proximate in time with Plaintiff's complaint to him with respect to workplace harassment.

93.     Upon information and belief, Defendant Majcher's actions were undertaken with the direct involvement of and support from Dr. Todorovic.

94.     Defendant CU failed to offer any accommodation whatsoever for Plaintiff's perceived disability; rather it facilitated her summary suspension from the medical staff and, through its agent, Defendant Majcher, sought her permanent removal.

***Dr. Slover's June 2020 Notice of Reappointment to the Medical Staff and Defendant CU's Failure to Reinstate Her***

95.     On June 1, 2020, the Chief Medical Officer of CHCO informed Dr. Slover of her reappointment to the medical staff, approving her privileges to "admit, evaluate, diagnose, treat and provide consultation to pediatric patients requiring services within the realm of pain medicine, **all** rights and responsibilities of physicians with Category IV privileges, placement of advanced invasive pain management devices and provision of advanced anesthetic blocks."

15

96.     Nevertheless, Dr. Slover's suspension was never lifted, and, on October 9, 2020, the administrative hearing panel issued a written decision upholding the summary suspension.

97.     Following an appeal to the CHCO board or directors, in an undated e-mail sent on or about February 19, 2021, the CHCO board of directors informed Dr. Slover that it had upheld the decision of the administrative hearing panel and that her administrative remedies had thereby been exhausted.  Notably, CHCO did not provide any independent analysis and solely affirmed the prior ruling.

### Pattern and Practice of Discrimination

98.     Between 2017 and 2019, a pattern and practice of age discrimination by Defendants emerged.  Two distinguished physicians with national reputations and longstanding employment by Defendant CU were separated from employment.  Although Plaintiff was unaware of it until the motives of Defendant Majcher became patently obvious, a pattern and practice of age discrimination, purging older, senior staff members, was emerging.

99.     Although unknown to Plaintiff until recently, illegal discrimination based upon age and religious affiliation has been widespread at Defendant CU and, notably, within the department. It was in this context that the group of nine physicians and researchers attempted to redress their complaints directly to the Regents of Defendant CU as any individual actions to that point had been utterly unavailing.

100.    Several claims have been filed or are pending against Defendant CU and/or Dr. Todorovic, including, specifically, allegations that the department under the leadership of Dr. Todorovic, and Defendant CU has discriminated against physicians over the age of forty (40) as well as non-Christian physicians.

101.    Other lawsuits against Dr. Todorovic and/or Defendant CU have arisen based on illegal behavior including *Gonzales v. University of Colorado, et al.,* No. 18-cv-01178 (D. Colo.); *Mandell v. University of Colorado, et al.,* No. 20-cv-03766 (D. Colo.); and *Strauss v.*

*University of Colorado, et al.,* No. 1:21-cv-01247 (D. Colo.).

102.    Notably, in *Gonzales*, the Court entered an order, dated March 19, 2020 in which it found, following a jury verdict favorable to plaintiff therein, that Defendant CU's complaint and investigation was highly flawed and that Dr. Todorovic's testimony lacked credibility.

***Violation of Public Policy Related to Plaintiff's Suspension***

103.    The ADA, AAADA and CADA constitute the public policy of the State of Colorado by prohibiting, among other things, discrimination against disabled individuals, discrimination against individuals with perceived disabilities, and retaliation against individuals who complain about discrimination.

104.    The State of Colorado amended CADA in 2016 to expressly impose affirmative obligations on employers, effective as of August 10, 2016.

105.    CADA requires employers to engage in an interactive process to identify reasonable accommodations.

106.    CADA provides a rebuttable presumption that a particular accommodation does not impose an undue hardship if the employer has provided similar accommodations to other classes of employees in the past.

107.     The knowing false reporting of Plaintiff as an individual with a perceived disability, failure to accommodate for an actual disability (hearing loss) and subsequent actions by Defendants CU and Majcher, violate the public policy of the State of Colorado because they were motivated by Plaintiff's perceived disability and/or age and by retaliation because Plaintiff complained about discriminatory and hostile treatment.

## FIRST CLAIM FOR RELIEF
(Discrimination and Hostile Work Environment in Violation of Title VII Against Defendant CU)

108.    The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

109.    Plaintiff, as a woman and member of the Church of the Latter-Day Saints, is a

member of a class of persons protected from discrimination on the basis of religion under Title VII.

110.    Defendant CU, by and through its agents, engaged in unlawful employment practices involving Plaintiff because she is affiliated with a "non-mainstream" Christian religion.

111.    Defendant CU, by and through its agents and Defendant Majcher, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. §2000e(2)(a). The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her religion.

112.    Defendant's unlawful employment practices, by and through its agents and Defendant   Majcher, had a disparate and adverse impact on Plaintiff because of her religious beliefs.

113.    Plaintiff was subjected to a hostile work environment based on membership in a protected class and suffered disparate treatment.

114.    Plaintiff's engagement in protected activity was a motivating factor in Defendants' conduct, causing her damages.

115.    Defendant CU is responsible for the acts and omissions of its agents and employees, including Defendant Majcher.

116.    As a result of Defendants' conduct, Plaintiff has suffered damages and losses.

117.    Defendants' conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

## SECOND CLAIM FOR RELIEF
(Violation of § 504 of the Rehabilitation Act Against Defendant CU)

118.    The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

119.    Defendant CU is an entity which receives federal financial assistance and is as

covered entity for the purposes of § 504 of the Rehabilitation Act.  As such, Defendant CU is prohibited from discriminating against any "qualified individual with a disability."

120.    Plaintiff is a qualified individual with a disability.  Specifically, she is qualified to perform the essential functions required of her, with or without reasonable accommodations.

121.    Plaintiff's particular disability is auditory in nature, which substantially limits one or more of her major life functions and/or major bodily functions.

122.    Defendant CU could accommodate Plaintiff without undue hardship.

123.    Defendant CU violated Section 504 of the Rehabilitation Act because it did not offer Plaintiff reasonable accommodations for her actual or perceived disability, instead falsely and repeatedly asserting that she was unable to perform the basic terms of her employment.

124.     Defendant CU failed to properly engage in any interactive process.

125.    Plaintiff has been injured as a result of Defendant CU's actions or lack thereof.

126.    As a result of Defendant CU's actions, Plaintiff has suffered damages, including but not limited to the loss of past and future wages and benefits, loss of professional opportunities and mental pain and anguish.

127.    Plaintiff is entitled to any and all relief permitted under the Rehabilitation Act.

128.    Plaintiff is entitled to attorneys' fees and cost incurred in this matter pursuant to 29 U.S.C. § 794a.

**THIRD CLAIM FOR RELIEF**
(Violation of the ADA and AAADA Against Defendant CU)

129.    The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

130.    Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8) in that she suffers from hearing loss, Defendant CU perceived her to be cognitively disabled, and she has the requisite knowledge and education to perform and can perform the essential functions of her position as Associate Professor of Anesthesiology.

19

131.    Defendant CU is an "employer" within the meaning of 42 U.S.C. §§ 12111(5), in that it is engaged in an industry affecting commerce and has more than fifteen (15) employees on each working day in each of the twenty (20) or more calendar weeks in the current and preceding years.

132.    Plaintiff is an employee of Defendant CU within the meaning of 42 U.S.C. § 12111(4).

133.    Defendant CU discriminated against Plaintiff by: (a) limiting, segregating or classifying Plaintiff is such a way as to adversely affect her status or opportunities because of actual or perceived disability within the meaning of § 12111(b)(1); (b) utilizing standards, criteria or methods of administration that have the effect of discrimination on the basis of disability within the meaning of § 12112(b)(3)(A); not making reasonable accommodations for known physical limitations of Plaintiff, an otherwise qualified individual with a disability who is an employee, despite the fact that doing so would not impose an undue hardship on the operation of Defendant CU's business within the meaning of § 12112(b)(5)(A); (c) utilizing qualification standards or other criteria with the specific intent to deny continuing employment opportunity to individuals with disabilities, despite the fact that doing so was not consistent with business necessity, within the meaning of § 12112(b)(6).

134.    Plaintiff has been damaged by Defendant CU's violation of the ADA inasmuch as Plaintiff has been unable to continue to use her education and training and clinical abilities.

135.    Plaintiff has been injured as a result of Defendant's actions or lack thereof.

136.    Plaintiff is entitled to any and all relief permitted under the ADA, 42 U.S.C. § 12117(a), as applicable to state entities, including injunctive relief.

### FOURTH CLAIM FOR RELIEF
(Retaliation in Violation of Title VII Against Defendant CU)

137.    The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

138.    Plaintiff participated in statutorily protected activity by opposing practices targeted at herself and others that were unlawful under Title VII, including discrimination based on race, national origin, religion, and pregnancy status, among others.

139.    As a result of Plaintiff's protected opposition to discrimination, Defendants retaliated against her by subjecting her to different terms and conditions of employment as described in this Complaint, including, but not limited to, treating Plaintiff in a disparaging and condescending matter, investigating Plaintiff without cause, failing to reinstate Plaintiff after she obtained a perfect score on cognitive testing examination, crediting accusations against Plaintiff that lacked basis, accusing Plaintiff of unprofessional conduct, failing to thoroughly and properly investigate or otherwise address Plaintiff's complaints about discrimination and making knowingly untrue statements about Plaintiff to others.

140.    Defendants' conduct violated 42 U.S.C. § 2000-3(a) of Title VII.

141.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation, and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of the enjoyment of life, and other non-pecuniary losses.

**FIFTH CLAIM FOR RELIEF**
(Discrimination and Retaliation Under ADEA Against Defendant CU)

142.    The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

143.    Defendants discriminated against Plaintiff in the terms or conditions of her employment because of her age, in violation of the ADEA.

144.    Plaintiff's age was the "but for" factor in Defendants' decisions to discriminate against Plaintiff.

145.    Defendants also retaliated against Plaintiff in the terms and conditions of her employment because of her protected complaints of age discrimination.

21

146.     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff has suffered and continues to suffer damages which include the loss of wages and benefits, among other things.

147.     Defendants' conduct was willful and intentional.

### SIXTH CLAIM FOR RELIEF
(Fourteenth Amendment Deprivations Under 42 U.S.C. § 1983 Against Defendant Majcher)

148.     The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

149.     Defendant Majcher, sued in his individual capacity, violated Plaintiff's rights protected by the Fourteenth Amendment, specifically, the right to due process before deprivation of property or liberty and the right to equal protection of the laws.

150.     By acting under color of state law to deprive Plaintiff of her constitutional rights, Defendant Majcher violated 42 U.S.C. § 1983.

151.     As a result of Defendant Majcher's actions, Plaintiff has suffered the loss of wages, benefits and other monetary benefits as well as emotional harm and psychological trauma.

152.     Defendant Majcher's unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed as legally permissible.

### SEVENTH CLAIM FOR RELIEF
(Violations of CADA Against Defendant CU)

153.     The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

154.      CADA, as amended, protects qualified individuals from discrimination in the terms and conditions of employment.

155.     Plaintiff was wrongfully stigmatized, suspended and removed from her position

on the basis of gender, religion, age and/or for engaging in protected activity.

156.    Defendants took adverse employment action against Plaintiff in retaliation for her complaint to the Ombudsman, a protected activity under CADA.

157.    Defendants articulated reasons for their conduct are merely pretext for unlawful discrimination.

158.    Defendant CU is liable for the acts and omissions of its agents and employees.

159.    Defendant CU either directly or by or through agents, discriminated against Plaintiff on the basis of her sex, religion, age and/or in retaliation for her protected activity, causing her injuries, damages and losses.

160.    As a result of Defendants' actions, Plaintiff has suffered the loss of wages, benefits and other monetary benefits as well as emotional harm, psychological trauma, and reputational injury.

**EIGHTH CLAIM FOR RELIEF**
(Equitable Estoppel under Colorado Law Against Defendant CU)

161.    The allegations contained within the preceding paragraphs are repeated here as if fully stated herein.

162.    Defendant CU, by promulgating and disseminating its Code of Ethics and Business Conduct and its Anti-Harassment Policies, committed to Plaintiff as well as all employees that they would not be subject to retaliation for filing ethics complaints or complaints of violations of Defendant CU's Anti-Harassment Policy.

163.    Plaintiff reasonably relied on such an anti-retaliation commitment to her detriment.

164.    As a result of Defendant CU's actions, Plaintiff has suffered the loss of wages, benefits and other monetary benefits as well as emotional harm, psychological trauma, and reputational injury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Dr. Robin Slover, requests that the Court enter judgment in her favor and against Defendants CU and Majcher as follows:

1.      Awarding Dr. Slover her lost back pay and benefits;

2.      Awarding Dr. Slover an amount equal to her front pay and benefits through her anticipated date of retirement;

3.      Awarding Dr. Slover the costs, including expert witness fees, and reasonable attorneys' fees she has incurred and will continue to incur in this matter;

4.      Awarding Dr. Slover punitive and exemplary damages;

5.      Awarding Dr. Slover pre- and post-judgment interest;

6.      Entering appropriate injunctive and declaratory relief; and

7.      Awarding Dr. Slover such other and further relief as the Court deems just and proper; and

8.      Awarding Dr. Slover compensatory damages, including but not limited to, those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

FURTHERMORE, Dr. Slover specifically requests that Defendant CU be enjoined from failing or refusing to:

1.      Provide sufficient remedial relief to make Dr. Slover whole for the losses she has suffered as a consequence of the discrimination and retaliation against her as alleged in the Complaint, including (a) the resumption of Dr. Slover's employment, on a full- or part-time basis, at her option, in her position with any necessary reasonable accommodations; and

2.      Take other appropriate non-discriminatory measures to overcome the effects of discrimination and retaliation.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED this 20th day of May, 2021.

24

Respectfully Submitted,

*/s/ Chet W. Kern*_____.
Chet W. Kern
Katz & Kern, LLP
44 Cook Street
Denver, CO  80206
Tel: 303-398-7000
E-mail: ckern@katzandkernllp.com

*Co-counsel for Plaintiff Robin Slover*


*/s/ David B. Seserman*_____.
David B. Seserman
Seserman Law LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
Telephone: 303.900.2406
dseserman@seserman.law

*Co-counsel for Plaintiff Robin Slover*

Plaintiff's Address:
19064 E. Pinewood Drive
Aurora, Colorado 80016